E-FILED[1]
Thursday, 27 March, 2008  04:18:42 PM
Clerk, U.S. District Court, ILCD

1

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE CENTRAL DISTRICT OF ILLINOIS
2


3

UNITED STATES OF AMERICA,            )
4                                    )
                        Plaintiff,   ) Criminal No.
5                                    ) 07-10077
            vs.                      ) Peoria, Illinois
6                                    ) October 25, 2007
JOSEPH PATE,                         )
7                                    )
                        Defendant.   )
8


9

                    CHANGE OF PLEA HEARING
10


11                        BEFORE:

12                 HONORABLE MICHAEL M. MIHM
                    United States District Judge
13


14                    APPEARANCES:

15                 BRADLEY W. MURPHY, ESQ.
                Assistant United States Attorney
16                200 Fulton Street, Suite 400
                    Peoria, Illinois  61602
17            (Appeared on Behalf of the Government)

18


19                 TIMOTHY CUSACK, ESQ.
                    P.O. Box 10461
20                Peoria, Illinois  61612
            (Appeared on Behalf of the Defendant)
21


22


23                 Karen S. Hanna, C.S.R.
                U.S. District Court Reporter
24                Central District of Illinois
Proceedings recorded by mechanical stenography, transcript
25 produced by computer

1      THE COURT:  This is the case of the United

2   States of America vs. Joseph Pate, criminal number

3   07-10077.  The defendant is in court represented by his

4   attorney, Timothy Cusack.  The United States is

5   represented by Brad Murphy.  Looks like it's set today for

6   a plea.  Would you approach the podium with your client,

7   please?  Mr. Pate, this process of tendering a plea of

8   guilty will involve your answering a number of questions

9   put to you while you're under oath, so please raise your

10   right hand to be sworn.

11                         **JOSEPH PATE,**

12   Having been first duly sworn, was examined and

13   testified under oath as follows:

14                  **E X A M I N A T I O N**

15   BY THE COURT:

16   Q     Now that you have been sworn, do you understand that

17   your answers to my questions are subject to the penalties

18   of perjury or of giving a false statement if you don't

19   answer truthfully?

20   A     Yes.

21   Q     What is your full name, sir?

22   A     Joseph Pate.

23   Q     Do you have a middle name?

24   A     Joseph Lee Pate.

25   Q     How old are you?

1    A      Twenty-three.

2    Q      How far did you go in school?

3    A      To the ninth grade.

4    Q      Have you been treated recently for any mental illness

5    or addiction to narcotic drugs?

6    A      No, sir.

7    Q      Are you currently under the influence of any drugs,

8    medication or alcoholic beverage?

9    A      No, sir.

10   Q      Have you received a copy of the indictment in this

11   case, that is the written charges?

12   A      Yes.

13   Q      Have you fully discussed the case, including any

14   possible defenses you might have, with Mr. Cusack as your

15   attorney?

16   A      Yes.

17   Q      Are you fully satisfied with the counsel,

18   representation and advice given to you in this case by

19   Mr. Cusack?

20   A      Yes.

21   Q      As I understand it, your willingness to plead guilty

22   here today is due, at least in part, to the discussions

23   that you and your attorney have had with the attorney for

24   the United States leading up to the execution of this

25   written plea agreement.  Is that correct?

1   A    Yes.

2   Q    Did you have a reasonable opportunity to read and

3   discuss the plea agreement with your attorney before you

4   signed it?

5   A    Yes.

6   Q    Does the plea agreement represent in its entirety

7   every understanding that you have with the Government?

8   A    Yes.

9   Q    Do you understand the terms of the agreement?

10  A    Yes.

11  Q    I'm going to walk through this agreement briefly.  I

12  would like you to follow along with me as I do that.  I'm

13  going to highlight what I believe to be the operative

14  terms.  When I finish doing that, I'll ask you if you have

15  the same understanding, okay?

16  A    Yes.

17  Q    On page 1, it indicates that it is the complete and

18  only agreement between you and the United States.

19          Page 2, paragraph 12.  The agreement is binding

20  only on the U.S. Attorney for this district.  It doesn't

21  bind any other prosecutor or investigating agency.  It's

22  the type of agreement where if you plead guilty and I

23  accept your plea, but at sentencing I do not accept the

24  sentencing recommendations that you make or the Government

25  makes, you would not have the right to withdraw your plea.

1              Paragraph 4.  You agree to plead guilty to

2     Count 1 charging you with possession with intent to

3     distribute cocaine base crack.

4              Paragraph 6 is a discussion of the penalties

5     you're facing.  Now the penalties that apply are

6     dependent, in part, on whether or not you have one or more

7     prior felony drug convictions.  Is it your understanding

8     that you do or do not have a prior felony drug conviction?

9     A     Yes.

10    Q     You do?  Okay.  And where was that?

11    A     Where?

12    Q     Where was that?  In Peoria County or somewhere else?

13    A     Yeah, Peoria County.

14    Q     In that case -- counsel, I assume that's correct?

15              MR. MURPHY:  That's correct.

16    Q     Then the penalty portion of paragraph 6 that applies

17    actually appears at the top of page 4.  It says there if

18    you have one or more prior felony drug convictions, it

19    carries a mandatory minimum sentence of 10 years, a

20    maximum sentence of life imprisonment, also a maximum fine

21    of up to $4 million, a special assessment of $100, a

22    special mandatory supervised release term of 8 years to

23    life.

24              This reference to supervised release means that

25    at the time of sentencing, in addition to imposing a

1  sentence of imprisonment, the Court would also order that

2  beginning the day that you're released from custody you

3  would go through this period of supervision which would

4  have to be at least 8 years long.  During that time your

5  conduct would be subject to a number of terms and

6  conditions.  If it was later determined that you had

7  violated any of those terms, you could be sent back to

8  prison.  Do you understand that?

9  A    Yes.

10  Q    You may also be required to pay an order of

11  restitution.  There's no agreement on that.  The Court

12  would make that decision at the time of sentencing.

13         Paragraph 9 at the bottom of page 4 is entitled

14  "Statutory Appeal Waivers, Notice of Prior Drug

15  Conviction".  In paragraph 9 you're expressly giving up

16  the right you would otherwise have to require the

17  Government to formally serve on you notice of the prior

18  conviction that they would plan to use to enhance your

19  penalties.

20         Paragraph 10 is titled "Waiver of Right of

21  Appeal from Conviction and Sentence".  In this paragraph

22  you're giving up the right to file a notice of appeal to

23  the -- or file an appeal to the Court of Appeals in

24  Chicago following your sentence if you're not happy with

25  your sentence or if you feel there's something unlawful or

1   unconstitutional about the process that was used here or

2   the sentence itself.  That could even include a claim that

3   your attorney had not effectively represented you.  In

4   this paragraph you're giving up the right to do that with

5   two very narrow exceptions.  First of all, you're not

6   giving up the right to appeal if I were to impose a

7   sentence beyond the statutory maximum provided.  In this

8   case, the statutory maximum is life, so that's not going

9   to happen.  The other reservation is you can still file an

10  appeal claiming that your attorney did not effectively

11  represent you concerning the negotiation of this plea

12  agreement.  But in all other respects you're giving up the

13  right to file an appeal.  Do you understand the very broad

14  nature of that waiver?

15  A    Yes, I do, sir.

16  Q    Do you have any questions about that?

17  A    Yeah.  No.  You can continue, sir.

18  Q    I'm sorry.  I can't hear you.

19  A    You can continue.  No questions.

20  Q    Well, if you have any questions, I would be very

21  happy to address them.

22  A    The only question, I was wondering -- I wanted to

23  ask -- when you say I don't have the right, I'm giving up

24  the right right now to put in a motion to say that my

25  lawyer didn't represent me right?

1    Q    In this paragraph you're giving up the right to make

2    a general claim that your attorney did not effectively

3    represent you.  What you're not giving up is the right to

4    claim on appeal that your attorney did not effectively

5    represent you concerning the negotiation of this document

6    with the attorney for the Government.

7    A    Okay.  I understand.

8    Q    Does that answer your question?

9    A    I understand.

10   Q    It's a very broad waiver.

11   A    Yes.

12   Q    The next paragraph, paragraph 11, is also a waiver

13   provision.  It's titled "Waiver of Right to Collateral

14   Attack".  In addition to an appeal, another avenue a

15   person can pursue if they feel that there was something

16   unlawful or unconstitutional about how their case was

17   handled is to collaterally attack the sentence.  That's

18   done usually by the filing of what's called a petition for

19   writ of habeas corpus.  That's a proceeding that's filed

20   here in the trial court.  In this paragraph you're giving

21   up the right to do that period.  Do you understand that?

22   A    Yes.

23   Q    Any questions about that?

24   A    No, sir.

25   Q    On page 7 at the top it says "Advisory Sentencing

1    Guidelines".  That covers paragraphs 12, 13, 14, 15,

2    almost all the way through the end of page 9.  Do you have

3    any questions about any of that?

4    A    No, sir.

5    Q    I want to talk to you for a moment about the second

6    paragraph of numbered paragraph 15 on page 9 where it

7    starts out "the United States reserves the right".  In

8    that paragraph the United States reserves the right in its

9    sole discretion to make a motion at the time of sentencing

10   for a downward variance from the advisory guideline range

11   and from any mandatory minimum sentence.

12         For example, in your case you're looking at a

13   mandatory minimum of 10 years, so this is important

14   language for you.  They reserve the right to do that if

15   you provide substantial assistance in the investigation or

16   prosecution of other crimes.  The extent of any such

17   recommended variance would depend solely on the U.S.'s

18   evaluation of the nature, extent and value of your

19   assistance.

20         You need to understand, first of all, that only

21   the United States can file this motion.  Your attorney

22   can't do it.  I can't raise the issue on my own.  If you

23   have a disagreement with the Government as to whether they

24   should file this motion, you have no way of forcing them

25   to file it.  Second, you have no way of forcing them to

1    ask for an amount of downward departure that you might

2    feel is fair.  Third, if they do file the motion, it's

3    entirely within the Court's discretion, the Judge's

4    discretion, to either grant the motion or deny it.  Do you

5    understand?

6    A     Yes.

7    Q     The next section, "Defendant's Obligations", bottom

8    of page 9 and goes through paragraph 19 at the top of

9    page 11, any questions about that section?

10   A     No, sir.

11   Q     The next section, "U.S. Attorney's Obligations",

12   that's paragraphs 20 through 23 ending on page 12, any

13   questions about that?

14   A     No, sir.

15   Q     The next paragraph is entitled "Factual Basis" and

16   that contains the details of what you allegedly did here.

17   Did you read this carefully before you signed it?

18   A     Yes.

19   Q     Is this an accurate statement of what happened?

20   A     Yes.

21   Q     Page 13, paragraph 25, "Effect of Violation of

22   Agreement".  That details the options that are available

23   to the Government if they conclude that you have violated

24   one or more terms of this agreement.

25              But then the next paragraph at the top of

1    page 14, paragraph 26, goes on to explain that before they

2    could exercise any of those options, they would have to

3    file a pleading with this Court alleging how you

4    supposedly violated the terms.  There would be a hearing.

5    At that hearing the Government would have to prove by a

6    preponderance of the evidence that you had in fact

7    violated the agreement and ultimately the Judge would make

8    the decision of whether or not you had violated the

9    agreement.  Do you understand?

10   A    Yes.

11   Q    Are these the terms of your agreement with the United

12   States as you understand them?

13   A    Yes, sir.

14   Q    Has anyone made any other or different promise or

15   assurance of any kind to you in an effort to induce you to

16   plead guilty?

17   A    No, sir.

18   Q    Has anyone attempted in any way to force you to plead

19   guilty?

20   A    No, sir.

21   Q    Are you pleading guilty of your own free will because

22   you are guilty?

23   A    Yes.

24   Q    Pardon?

25   A    Yes.

1    Q    Do you understand that the offense to which you're

2    pleading guilty is a felony offense?  If your plea is

3    accepted, you will be adjudged guilty of that offense.

4    Such adjudication may deprive you of valuable civil rights

5    such as the right to vote, the right to hold public

6    office, the right to serve on a jury and the right to

7    possess any kind of firearm.  Do you understand?

8    A    Yes, sir.

9    Q    I've already discussed with you the maximum possible

10   penalties provided by law.  We've talked about the

11   mandatory minimum.  We've discussed supervised release.

12   Do you understand that if you violate the conditions of

13   supervised release you could be given additional time in

14   prison?

15   A    No, I didn't understand that.

16   Q    Al right.  Well, what I explained to you earlier was

17   that at the time of sentencing, the Court will impose a

18   sentence.  Let's just say for purposes of example that you

19   were sentenced to custody for 10 years.  You would go off

20   and you would serve your sentence.  At the same time that

21   I imposed that part of the sentence, I would also order

22   that beginning the day that you're released from custody

23   you would go through a long period of supervision called

24   supervised release.

25   A    For the 8 years.

1  Q     That 8 years, that's what I'm talking about here.

2  What I'm saying is if you violated the conditions during

3  this supervised release period, you could be given

4  additional time in prison.  Do you understand that?

5  A     I do now, yeah.

6  Q     Do you have any additional questions about that?

7  A     Yeah, like why would it be so long though?

8  Q     Well, because Congress has made it so long and the

9  Sentencing Commission has made it that long.  In other

10  words, the Court has no discretion in this situation where

11  the enhanced penalties apply.  I could not impose a

12  supervised release term of say 4 years.  That would not be

13  considered a legal sentence.  The Government could appeal

14  and the Court of Appeals would reverse it.  I'm not

15  entirely sure I can answer the question of why it's so

16  long.  I guess the theory is that if you qualify for this

17  enhanced sentence, then in addition to it being a longer

18  prison sentence because of what you did to qualify for the

19  enhancement, that it's apparent that you need a longer

20  period of supervision.  That's the best answer I can give

21  you.

22  A     Okay.

23  Q     We've discussed the fine, the special assessment,

24  possibility of an order of restitution.  Do you understand

25  all of these possible consequences of your plea?

1    A    Yes, sir.

2    Q    Have you and Mr. Cusack talked about how the

3    sentencing guidelines might apply to your case?

4    A    Yes.

5    Q    Do you understand that the Court will not be able to

6    determine the advisory guideline range for your case until

7    after the pre-sentence report has been completed and you

8    and the Government have had an opportunity to challenge

9    the reported facts and the application of the guidelines

10   recommended by the probation officer and that the sentence

11   imposed may be different from any estimate your attorney

12   may have given you up to that point?  Do you understand

13   that?

14   A    Yes.

15           THE COURT:  Mr. Cusack, what's the worst case

16   scenario that you have discussed with your client

17   concerning the advisory sentencing guidelines?

18           MR. CUSACK:  Your Honor, we believe that he

19   would be at a level 30 with a criminal category of IV, so

20   it would be 135 to 168.  However, with cooperation, he

21   would net 100 to 125 months.

22   BY THE COURT:

23   Q    Is that correct?  Have you had that discussion with

24   your attorney?

25   A    Yes.

1    Q    In this type of situation there are actually two

2    things going on at the same time.  One is this mandatory

3    minimum of 120, okay?

4    A    Yeah.

5    Q    If that mandatory minimum remains, in other words if

6    the Government doesn't file this cooperation motion, if

7    that 120 stays, if the guidelines -- if I determine that

8    the guidelines come in lower than that, it would be as if

9    the guidelines don't even exist.  I would have to sentence

10    you to 120.  If the guidelines come in higher than 120,

11    then depending on the findings that I make at the time of

12    sentencing, I would have the discretion to impose a

13    sentence that was above the guideline range or within the

14    range or below the range, but I couldn't go below the 120.

15    Do you understand that?

16    A    Yes.

17    Q    Parole has been abolished.  You would not be released

18    on parole.  What that means is you would serve 100 percent

19    of your sentence except you would qualify for up to 54

20    days of good time reduction a year, so assuming good

21    behavior you would serve approximately 85 percent of your

22    sentence.  Do you understand?

23    A    Yes.

24    Q    Do you recall a few minutes ago I discussed with you

25    that with two very narrow exceptions you are giving up the

1    right to file an appeal in this case?  Do you recall that

2    discussion?

3    A    Yes.

4    Q    Do you also understand that under some circumstances

5    the Government may have the right to appeal the sentence

6    that I impose?

7    A    I know that now.

8    Q    For example -- well, I gave you an example already.

9    Let's say that I imposed a period of 4 years supervised

10   release.  They could appeal that.  Do you understand?

11   A    Yes.

12   Q    Do you understand that by entering into this

13   agreement and entering a plea of guilty you will have

14   waived or given up almost all of your right to appeal or

15   collaterally attack any part of this sentence?

16   A    Yes.

17   Q    Do you understand that you have a right to plead not

18   guilty to any offense charged against you and to persist

19   in that plea, that you would then have the right to a

20   trial by jury, that at trial you would be presumed to be

21   innocent and the Government would have to prove your guilt

22   beyond a reasonable doubt, that you would have the right

23   to the assistance of counsel for your defense, the right

24   to see and hear all the witnesses and have them

25   cross-examined in your defense, the right on your own part

1    to decline to testify unless you voluntarily elected to do

2    so in your own defense and the right to the issuance of

3    subpoenas or compulsory process to compel the attendance

4    of witnesses to testify in your defense?  Do you

5    understand all those rights?

6    A    Yes.

7    Q    Do you understand that at such a trial, should you

8    decide not to testify or not to put on any evidence, those

9    decisions cannot be used against you?

10   A    Yes.

11   Q    Do you further understand that by entering a plea of

12   guilty, if that plea is accepted by the Court, there will

13   be no trial and you will have waived or given up your

14   right to a trial as well as those other rights associated

15   with a trial as I've just described them?  Do you

16   understand?

17   A    Yes.

18   Q    Count 1 of the indictment in this case charges that

19   on about June 6 of 2007 that you were operating a vehicle

20   in Peoria County in this federal district and at that time

21   that you did knowingly possess more than 5 grams of a

22   mixture and substance containing cocaine base crack, a

23   Schedule II controlled substance, with intent to

24   distribute.

25            The word "knowingly" in this charge is defined

1    as meaning that your conduct was voluntary, that you

2    understood what you were doing, that your conduct was not

3    the result of ignorance, accident, mistake or some other

4    innocent reason.  Do you understand that definition?

5    A    Yes.

6    Q    Also, this phrase "with intent to distribute" means

7    that you possessed this amount of crack cocaine with the

8    intent to transfer possession of it to someone else,

9    either by gift or by sale.  Do you understand that?

10    A    Yes.

11    Q    Any questions concerning what you're charged with?

12    A    No.

13    Q    If this count were to go to trial, the Government

14    would be required to prove certain elements beyond a

15    reasonable doubt.  They would have to prove, first, that

16    you did in fact knowingly and intentionally possess crack

17    cocaine.  Second, they would have to prove that you

18    possessed the crack cocaine with the intent to distribute

19    it.  Third, they would have to prove that at the time you

20    knew this substance was a controlled substance.  And

21    fourth, they would have to prove that the weight of the

22    crack cocaine was more than 5 grams.  Do you understand

23    what they would have to prove if this count went to trial?

24    A    Yes.

25    Q    Then I need to talk to you about what you did here to

1    satisfy myself that you are in fact guilty as charged.

2    Going back to June 6, where were you living at that time?

3    A    I was staying with my mother.

4    Q    Was that on Ayres Street?

5    A    No.

6    Q    I'm sorry?

7    A    No.

8    Q    At some point that day were you at 2014 West Ayres?

9    A    Yes.

10   Q    And at some point that day did you leave that address

11   driving a vehicle?

12   A    Yes.

13   Q    And as I understand it, you did not have a valid

14   driver's license at that time; is that correct?

15   A    Yes.

16   Q    The police pulled you over, stopped your car?

17   A    Yes.

18   Q    What did you do when they stopped your car?

19   A    I ran.

20   Q    Where did you run?

21   A    To a nearby friend's house.

22   Q    To a near what?

23   A    Friend's house.

24   Q    Did you go in the house?

25   A    Yes.

```
 1   Q    Did the police follow you in the house?

 2   A    After they heard I was in the house.  They didn't

 3   follow me to the house.

 4   Q    Were you arrested at that time?

 5   A    Yes.

 6   Q    They searched your vehicle?

 7   A    Yes.

 8   Q    It says here in paragraph 24 they found a clear

 9   plastic sandwich bag.  Was that your sandwich bag?

10   A    Yes.

11   Q    What was in the sandwich bag?

12   A    Crack cocaine.

13   Q    It says here it was in six individual clear plastic

14   baggies.  Is that correct?

15   A    I believe so.

16   Q    Where was that in the car?

17   A    I couldn't tell you exactly where it was at.

18   Q    Was it somewhere in the passenger portion of the car

19   up where the seats are?

20   A    Not to my knowledge.

21   Q    I'm sorry?

22   A    Not to my knowledge.

23   Q    What does that mean?

24   A    Like I don't know exactly where it was at.

25   Q    Was it in the trunk?
```

```
 1    A     No.  It was in the car, but I didn't know exactly
 2   where it was at.
 3    Q     Who put it there?
 4    A     I did.
 5    Q     What did you believe that substance was?
 6    A     Crack cocaine.
 7    Q     What were you planning to do with that crack cocaine?
 8    A     Give it away.
 9    Q     I'm sorry?
10    A     Give it away.
11    Q     Not sell it?
12    A     Yeah.
13    Q     Were you going to sell it, give it away or both?
14    A     I was going to give it away.
15    Q     It says here the weight was 16.7 grams.  Does that
16   sound correct?
17    A     No.
18    Q     Pardon?
19    A     No.
20    Q     Not correct?
21              MR. MURPHY:  Judge, the actual weight at the lab
22   was 13.7.  The additional is packaging.
23    Q     Okay.  They also served a search warrant at 2014 West
24   Ayres?
25    A     Yes.
```

1   Q    It says they found some additional crack cocaine

2   there.  Is that correct?

3   A    Yes.

4   Q    Where was that?

5   A    Kitchen area.

6   Q    Did you know that was there?

7   A    No.

8   Q    You did not know that was there?

9   A    No.

10  Q    So you don't feel that you're responsible for the

11  28.9 grams that they found?

12  A    Not at the house.

13  Q    Pardon?

14  A    Not at the house.

15          THE COURT:  I don't believe -- I don't know if

16  that's in dispute or not.  I don't believe that whether

17  it's in dispute or not is relevant to him pleading guilty

18  to possession with intent to distribute more than 5 grams.

19          MR. MURPHY:  Judge, it's not what I would call

20  relevant to Count 1 because Count 1 deals with what's in

21  the car.  However, I will indicate that he did give a

22  statement later indicating that they belonged to him.  I

23  don't know for sure he's telling the truth or not.  All

24  I'm saying, I think it's very relevant for purposes of

25  sentencing in terms of determining the amount of relevant

1    conduct, but --

2    BY THE COURT:

3    Q    But that's an issue for another day.  I am a little

4    curious about your saying that you planned to give these

5    six individually wrapped amounts of crack cocaine away.

6    You were not going to sell it?

7    A    Yeah, I was going to sell it.

8    Q    Okay.  Did you understand that this conduct of

9    possessing that amount of crack cocaine in your car with

10   the intent to distribute, to sell it, did you understand

11   that was criminal conduct?

12   A    Yes.

13   Q    I'm going to ask the Government now to tell me what

14   they believe their evidence would be if this case went to

15   trial.  When he finishes making that statement, I'll ask

16   Mr. Murphy -- I will ask you if you feel that is an

17   accurate statement of what happened.  Okay?

18   A    Yes.

19            MR. MURPHY:  Judge, in early June of this year

20   members of the Peoria Police Department Special

21   Investigations Division were conducting an investigation

22   of the defendant, Joseph Pate, as they had received

23   information that he was a drug trafficker.  Their

24   investigation led them to obtain a search warrant for the

25   person of Mr. Pate and for his residence at 2014 West

1    Ayres in Peoria, which is in the Central District of

2    Illinois.   They set up surveillance on June 6 of 2007 on

3    2014 West Ayres.   They observed Mr. Pate leave that

4    residence driving a vehicle.   They were aware that he

5    didn't have a valid driver's license and when he was away

6    from the residence they conducted a traffic stop on the

7    vehicle.   The vehicle did properly stop.   However, as the

8    officers got out of their vehicle and were approaching the

9    driver's side, Mr. Pate, as he has indicated, bolted from

10   the vehicle and ran to a house nearby in the 800 block of

11   South Blaine Street.   The officers pursued him.   He went

12   in that residence and was arrested in an upstairs bathroom

13   of the residence.   A search of the vehicle from which he

14   ran discovered a plastic sandwich bag that contained six

15   individual clear plastic baggies each containing crack

16   cocaine, a total weight of which was 16.7 grams.   That was

17   located on the front driver's seat in the vehicle.

18        A short time later the search warrant was

19   executed over at 2014 West Ayres and during that search

20   the officers also located another clear plastic bag that

21   contained what appeared to be almost an ounce of crack

22   cocaine.   At the laboratory it was tested to be 26.4 grams

23   of cocaine base crack.   That was found in a box of

24   sandwich bags that was on the kitchen table at the time

25   the officers found it.   Located also in the home was a

1    digital scale with cocaine residue, what appeared to be

2    math on a piece of paper that were drug notes and over

3    $22,000 in U.S. currency.

4            When Mr. Pate was interviewed at the Peoria

5    Police Department and after waiving his Miranda warnings,

6    he admitted that the crack cocaine in the vehicle and the

7    crack at the residence belonged to him and that he sold

8    crack in the Peoria area.

9    BY THE COURT:

10   Q    Is this an accurate statement of what happened?

11   A    Yes.

12   Q    Now Mr. Murphy says that you gave the police a

13   statement in which you admitted knowing of the crack

14   cocaine at your house.  Did you tell the police that?

15   A    Yes.

16   Q    So I'm not quite sure what you meant by your

17   statement a couple of minutes ago you didn't know it was

18   there.

19   A    Well, I didn't know anything about the ounce.

20   Q    I'm sorry?

21   A    I didn't know nothing about the ounce.  Well, I admit

22   it's mine.

23   Q    I'm sorry?

24   A    It's mine.

25   Q    I can't hear you.

1   A    It's mine.

2   Q    How do you now plead to the charge of unlawful

3   possession of more than 5 grams of cocaine base crack, a

4   Schedule II controlled substance, with intent to

5   distribute as charged in Count 1 of the indictment, guilty

6   or not guilty?

7   A    Guilty.

8   Q    It is the finding of the Court in the case of the

9   United States of America vs. Joseph Pate that the

10  defendant is fully competent and capable of entering an

11  informed plea, that the defendant is aware of the nature

12  of the charges and the consequences of the plea and his

13  plea of guilty is a knowing and voluntary plea supported

14  by an independent basis in fact containing each of the

15  essential elements of the offense.  The plea is,

16  therefore, accepted and the defendant is now adjudged

17  guilty of that offense.

18         The Court directs the probation office to

19  prepare a written pre-sentence report.  Mr. Pate, you will

20  be asked to give information for that report.  Your

21  attorney will be with you during that process if you want

22  him to be.  Once the report is prepared, copies will be

23  made available to everyone, including you.  You will be

24  expected to read the report very carefully, review it

25  carefully with your attorney and then tell us whether you

1    believe the report is accurate and complete.  If there are

2    any disputes concerning the accuracy or completeness of

3    the report, I will resolve those at a sentencing hearing

4    that I would recommend occur on Friday, February 22, at

5    10:00 a.m.  Is that date and time agreeable to both sides?

6              MR. MURPHY:  Yes, Your Honor.

7              MR. CUSACK:  Yes, Your Honor.

8              THE COURT:  Anything else?

9              MR. MURPHY:  No.

10             THE COURT:  Okay, Mr. Pate.  See you in

11   February.  Thank you.

12                   **  *  *  HEARING CONCLUDED  *  *  ***

13                        **REPORTER'S CERTIFICATE**

14

15             I, Karen S. Hanna, certify that the

16   foregoing transcript constitutes a true and accurate

17   transcript of the original shorthand notes of the

18   proceedings had at the time and place aforesaid

19   before the HONORABLE MICHAEL M. MIHM, U.S. District

20   Judge.

21

22                               s/ Karen S. Hanna
                                 Karen S. Hanna, C.S.R.
23                               License #084-001760

24

25